IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JULIA L. KURTZ, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| versus | § | CIVIL ACTION NO. H-08-388 |
| | § | |
| MICHAEL J. ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| *Defendant*. | § | |

**MEMORANDUM AND ORDER**

Pending before the Court is Plaintiff Julia L. Kurtz's ("Kurtz") and Defendant Michael J. Astrue's, Commissioner of the Social Security Administration (the "Commissioner"), cross-motions for summary judgment. Kurtz appeals the determination of an Administrative Law Judge ("the ALJ") that she is not entitled to a waiver or adjustment of administrative recovery of the overpayment of Title II disability insurance payments in the amount of $92,761.51. *See* 42 U.S.C. §§ 405(g), 1383(b), and 1383(c)(3). Having reviewed the pending motions, the submissions of the parties, the pleadings, the administrative record, and the applicable law, the Court is of the opinion that Kurtz's Motion for Summary Judgment (Docket Entry No. 12) should be denied, the Commissioner's Motion for Summary Judgment (Docket Entry No. 14) should be granted, and the Commissioner's decision denying Kurtz a waiver or adjustment of administrative recovery of the overpayment of Title II disability insurance payments should be affirmed.

**I.    *Background***

On May 17, 1991, Kurtz began receiving Title II disability benefits because she was unable to work due to chronic fatigue and depression. (R. 27). In May 1995, Kurtz notified the Social

Security Administration ("SSA") that she was returning to work on a part-time basis because of hardship imposed upon her by a divorce. (R. 27, 36, 227). On September 19, 2005, the SSA notified Kurtz in a letter that her nine-month trial work period would end in January 1996, at which time, her claim would be reviewed to see if she remained eligible for disability benefits. (R. 27, 225-226).

In August 1996, the SSA notified Kurtz that she might not be able to continue receiving disability checks due to her work activity. (R. 172). The SSA sent with the letter a brochure entitled "Benefits for Disabled People Who Return to Work" to explain the importance of Kurtz's work activity. *Id*.

After the trial work period ended, Kurtz began a 36-month extended period of eligibility ("EPE"), wherein she could receive benefits in months that she did not make substantial gainful activity. (R. 27, 39). Kurtz's EPE should have ended in 1999. (R.27). Kurtz received notice of this on November 17, 2000. (R. 232-234).

In February 2000, the SSA sent Kurtz a notice of continuing disability review, advising that her work activity could preclude her from receiving disability checks. (R. 36). In November 2000, the SSA further notified Kurtz that her work earnings could affect her disability payments and it was likely her "disability payments ended because of substantial work and that you are not entitled to payments beginning October 1996." (R. 38-40). On November 17, 2000, the SSA completed a worksheet entitled "Cessation or Continuance of Disability or Blindness Determination and Transmittal," which determined that Kurtz's disability ceased in July 1996 and the period of disability terminated at the close of the last day of September 1996. (R. 37). In an undated letter, Kurtz was notified that her disability ended because of substantial work and that she was not entitled to payments beginning October 1996. (R. 33-35).

Kurtz's earnings records show that from September 1996 through July 2001, Kurtz engaged in substantial gainful activity ("SGA"). (R. 217). Kurtz worked as an attorney and posted earnings of $28,749 in 1995, which was well over the $500 per month allowed for SGA in that year.[1] (R.27). Kurtz earned $26,772 in 1996, $17,522 in 1997, $46,752 in 1998, $72,600 in 1999, $72,987 in 2000, and $76,136 in 2001. (R. 27).

On August 30, 2001, Kurtz filed a request for waiver of overpayment, asserting that the overpayment was not her fault and that she could not afford to pay the money back and/or it is unfair for some other reasons. (R. 41-48). On September 26, 2001, the SSA sent Kurtz a billing statement regarding the amount of benefits she had been overpaid, $92,761.51, and the date payment was due. (R. 112). On October 25, 2001, Kurtz's request for waiver of the overpayment was denied. (R. 49-56).

On December 28, 2001, Kurtz filed a request for hearing before an ALJ. (R. 57). The SSA, however, mistakenly entered the date it received Kurtz's request (*i.e.*, January 11, 2002) as the date it was filed. (R. 57). Because Kurtz's request did not appear to be filed within 60 days of the denial of the request for waiver, the ALJ dismissed her request for hearing as untimely on January 31, 2003. (R. 68-69). Kurtz filed a request to reopen, submitting documentation from the U.S. Postal Service that she had timely filed her request for hearing. (R. 94-97). On April 18, 2003, the ALJ rescinded the order of dismissal and restored Kurtz's request for hearing. (R. 74-75).

---

[1] Before 1999, $500 per month constituted substantial gainful activity. In 1999 and 2000, the amount was increased to $700 per month. In 2001, it increased to $740 per month. (R. 27).

On September 27, 2005, a hearing was held in Houston, Texas, before an ALJ. (R. 288-290). Kurtz did not appear at the hearing, but, through her counsel, advised the ALJ that she had left Houston due to weather-related issues surrounding Hurricane Rita. (R. 289). Kurtz requested a continuance of the hearing, which was granted. (R. 289). On March 22, 2006, a hearing was held in Houston, Texas, before an ALJ. (R. 241-258). Because an issue arose that the ALJ's file may not be complete with all of Kurtz's records, Kurtz briefly testified and the record remained open to receive additional evidence. (R. 243, 256-257). On October 11, 2006, the hearing before the ALJ resumed and Kurtz testified. (R. 258-286).

On November 16, 2006, the ALJ issued a decision denying Kurtz's request for a waiver of the overpayment of benefits. (R. 26-32). On November 22, 2006, Kurtz filed a request for review of the ALJ's decision with the Appeals Council of the SSA's Office of Hearings and Appeals (R. 19-22), which, on December 3, 2007, declined to review the ALJ's determination. (R. 4-6). This rendered the ALJ's opinion the final decision of the Commissioner. *See Sims v. Apfel*, 530 U.S. 103, 107 (2000). Kurtz filed her original complaint in this case on February 1, 2008, seeking judicial review of the Commissioner's denial of her request for waiver of the overpayment of benefits. *See* Docket Entry No. 1.

**II.**   *Analysis*

    **A.**   *Standard of Review*

        **1.**   *Summary Judgment*

The court may grant summary judgment under FED. R. CIV. P. 56(c) when the moving party is entitled to judgment as a matter of law because there is no genuine issue as to any material fact. The burden of proof, however, rests with the movant to show that there is no evidence to support the

nonmoving party's case. If a reasonable jury could return a verdict for the nonmoving party, then a motion for summary judgment cannot be granted because there exists a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

An issue of fact is "material" only if its resolution could affect the outcome of the case. *See Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 189 (5th Cir. 1991). When deciding whether to grant a motion for summary judgment, the court shall draw all justifiable inferences in favor of the nonmoving party and deny the motion if there is some evidence to support the nonmoving party's position. *See McAllister v. Resolution Trust Corp.*, 201 F.3d 570, 574 (5th Cir. 2000). If there are no issues of material fact, the court shall review any questions of law *de novo*. *See Merritt-Campbell, Inc. v. RxP Prods., Inc.*, 164 F.3d 957, 961 (5th Cir. 1999). Once the movant properly supports the motion, the burden shifts to the nonmoving party, who must present specific and supported material facts, of significant probative value, to preclude summary judgment. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *International Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Compania Mexicana de Aviacion, S.A. de C.V.*, 199 F.3d 796, 798 (5th Cir. 2000).

### 2. *Administrative Determination*

As with all social security cases, judicial review of the Commissioner's decision that an overpayment may not be waived is limited to determining whether the decision is supported by substantial evidence on the record as a whole and whether the proper legal standards were applied to evaluate the evidence. *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002); *see also Austin v. Shalala*, 994 F.2d 1170, 1174 (5th Cir. 1994). "Substantial evidence" means that the evidence must be enough to allow a reasonable mind to support the Commissioner's decision; it must be more than

a mere scintilla and less than a preponderance. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Masterson*, 309 F.3d at 272; *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

When applying the substantial evidence standard on review, the court "scrutinize[s] the record to determine whether such evidence is present." *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001) (citations omitted). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. *See Watson v. Barnhart*, 288 F.3d 212, 215 (5th Cir. 2002). Alternatively, a finding of no substantial evidence is appropriate if no credible evidentiary choices or medical findings support the decision. *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). The court may not, however, re-weigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner. *See Masterson*, 309 F.3d at 272. In short, "[c]onflicts in the evidence are for the Commissioner and not the courts to resolve. *Id*.

In the case at bar, the ALJ made the following findings:

1. The claimant received $92,761.51 in Social Security benefits for September 1996 through July 1999 and from then through July 2001.

2. The claimant was not entitled to the Social Security benefits paid for September 1996 through July 1999 and from then through July 2001.

3. The claimant incurred an overpayment of $92,761.51.

4. The claimant clearly knew, or reasonably should have known, that the benefits paid for September 1996 through July 1999 and from then through July 2001 were not due her.

5. The claimant was materially at fault in causing the overpayment.

6. The testimony of the claimant was not credible nor was it supported by the record as a whole.

7. The claimant has assets from which the overpayment can be refunded.

      8.      Recovery or adjustment of the overpayment cannot be waived.

(R. 31-32).

    **C.**    ***Issues Presented***

Kurtz claims that the ALJ erred in denying her request for waiver of overpayment. Specifically, Kurtz contends that she was without fault in accepting the overpayments and that recovery is against equity and good conscience. Kurtz further asserts that recovery defeats the purpose of the Act, as it would deprive Kurtz of income required for ordinary and necessary living expenses. Finally, Kurtz argues that the SSA is effectively enjoined from attempting to recover the money. *See* Docket Entry No. 12. The Commissioner disagrees with Kurtz's contentions, maintaining that the ALJ's decision is supported by substantial evidence. *See* Docket Entry No. 14.

    **D.**    ***Recovery of Overpayment of Benefits***

        **1.**    ***42 U.S.C. § 404***

The procedure for adjustment or recovery of excess Social Security benefits is governed by 42 U.S.C. § 404, which provides in relevant part:

> (1)    Whenever the Commissioner of Social Security finds that more or less than the correct amount of payment has been made to any person under this subchapter, proper adjustment or recovery shall be made, under regulations prescribed by the Commissioner of Social Security, as follows:
>
>     (A)    With respect to payment to a person of more than the correct amount, the Commissioner of Social Security shall decrease any payment under this subchapter to which such overpaid person is entitled, or shall require such overpaid person or [her] estate to refund the amount in excess of the correct amount, or shall decrease any payment under this subchapter payable to [her] estate or to any other person on the basis of the wages and self-employment income which were the basis of the payments to such overpaid person, or shall obtain recovery by means of reduction in tax refunds based on notice to the Secretary of the Treasury . . ., or shall apply any combination of the foregoing . . . .

* * *

> (b) No recovery from persons without fault. In any case in which more than the correct amount of payment has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this subchapter or would be against equity and good conscience. In making for purposes of this subsection any determination of whether any individual is without fault, the Commissioner of Social Security shall specifically take into account any physical, mental, educational, or linguistic limitation such individual may have (including any lack of facility with the English language).

42 U.S.C. § 404.

The Commissioner has promulgated regulations which further interpret the terms "without fault" and "against equity and good conscience." In this regard, the regulation interpreting "without fault" provides:

> . . . [w]here an individual or other person on behalf of an individual accepts such overpayment because of reliance on erroneous information from an official source within the Social Security Administration . . . with respect to the interpretation of a pertinent provision of the Social Security Act or regulations pertaining thereto, . . . such individual, in accepting such overpayment, will be deemed to be without fault.

20 C.F.R. § 404.510a. Another regulation provides further guidance regarding when an adjustment or recovery will be waived:

> (a) Adjustment or recovery deemed "against equity and good conscience." In the situations described in §§ 404.510(a)(b) and (c) and 404.510a, adjustment or recovery will be waived since it will be deemed such adjustment or recovery is against equity and good conscience.

20 C.F.R. § 404.512(a). "Fault," as used in "without fault," only applies to the individual, not the Social Security Administration. *See Cress v. Barnhart*, 51 Fed. Appx. 483, 2002 WL 31319322, at *1 (5th Cir. Sept. 30, 2002). Thus, even though the SSA may have been at fault in making the overpayment "that fact does not relieve the overpaid individual or any other individual from whom

8

the administration seeks to recovery the overpayment from liability for repayment." *See* 20 C.F.R. § 404.507. An individual is not "without fault" under this provision if she accepts payments which she knew or had reason to know were incorrect. *See* 20 C.F.R. § 404.507(c). The individual seeking the waiver of overpayment bears the burden of proof that she was without fault. *See Bray v. Bowen*, 854 F.2d 685, 687 (5th Cir. 1998).

### 2. *Kurtz's Assertion that She is "Without Fault"*

As set forth above, Kurtz bears the burden of proof that she was without fault. *See Bray*, 854 F.2d at 687. Kurtz raises several explanations for why she believes she was without fault in connection with the overpayment. As a threshold matter, Kurtz argues that she was without fault because she kept the SSA duly informed about her work activity. Kurtz also asserts that the SSA never contacted her about her earnings. (R. 266-267). The record, however, belies Kurtz's assertion, as the record indicates that only once did Kurtz actively (as opposed to passively returning earnings forms) contacted the SSA about her work activity. (R. 227). On May 22, 1995, Kurtz notified the SSA that she had returned to work. (R. 227). As early as September 1995, Kurtz had notice that her work activity could terminate her eligibility for disability benefits. Indeed, on September 19, 1995, the SSA notified Kurtz in a letter that her 9-month trial work period ended in January 1996, at which time, her claim would be reviewed to see if she was still eligible for disability benefits. (R. 225-226). The record does not appear to contain evidence showing that after the completion of Kurtz's trial work period she notified the SSA that she continued to work. Instead, it appears that it only was after the SSA contacted her about her continued work activity that she completed an earnings report. (R. 172).

The SSA notified Kurtz in writing on August 24, 1996, that she might not be able to continue receiving disability checks due to her work activity. (R. 172). The SSA enclosed with the letter a brochure "Benefits for Disabled People Who Return to Work" to explain the importance of Kurtz's work activity. *See id.* On February 21, 2000, the SSA again notified Kurtz that her work activity could preclude her from receiving disability checks. (R. 36). On November 17, 2000, the SSA further notified Kurtz that her work earnings could affect her disability payments and it was likely her "disability payments ended because of substantial work and that you are not entitled to payments beginning October 1996." (R. 38). This letter explained that going to work does not affect payments right away because she was allowed a period of 9 trial work months to test her ability to work in spite of health problems. (R. 39).

Next, Kurtz argues that she did not know that she was receiving any benefit improperly because nothing in the record suggests that she knew or should have know what constituted SGA. Likewise, Kurtz contends that she received annual letters from the SSA, between 1997-2001, informing her that due to additional earnings that had not previously been available for inclusion in calculating her benefits, which increase as one's earnings history increases, Kurtz's monthly benefit amount actually was being increased. (R. 136-143, 173-175, 176-178, 179-184, 185-190). According to Kurtz, she should be considered without fault in accepting the overpayments because she relied on the SSA's notices increasing her monthly benefits because of increased earnings. *See* 20 C.F.R. § 404.510(b), (g).

Contrary to Kurtz's contentions, substantial evidence supports the ALJ's finding that Kurtz was not "without fault." In fact, the SSA's multiple notifications demonstrate that Kurtz knew or should have known that her work activity could affect her eligibility to continue receiving disability

benefits. Additionally, such notices further evidence that Kurtz knew or should have known that information related to her SGA was material to her continued receipt of benefits. Finally, the notices demonstrate that Kurtz knew or should have known that it was incorrect to continue to accept payments while she was engaged in SGA. *See* 20 C.F.R. § 404.507(b)-(c).

The mere fact that the SSA may have been partially at fault in causing the overpayment does not relieve Kurtz, who is materially at fault in causing the overpayment from recovery or adjustment of the amount incorrectly paid.[2] *See* 20 C.F.R. § 404.507. Kurtz testified that she "did not look into" what level on income constituted SGA and that she "didn't think [she had] an affirmative duty" to make that determination. (R. 280). When asked if she acted reasonably under the circumstances, Kurtz responded, "I feel like I acted reasonably. I was sick, I was taking care of my family, a single mom, and I was not feeling like an attorney, I was not acting like an attorney, I was trying to survive." Kurtz's testimony is disingenuous, at best. The record demonstrates that Kurtz was capable of earning over $70,000 a year as an attorney, primarily through research and writing for various attorneys and/or law firms. (R. 76, 82, 84, 270). While convenient to claim ignorance and ineptitude when it relates to the propriety of continuing to receive disability benefits while making a sizeable income, it is not reasonable and fails to prove "without fault." For these reasons, there is sufficient

---

[2] Under SSA policy, a person can be misinformed only if that person actively seeks information which, given either orally or in a notice, subsequently proves to be incorrect. *See* Program Operations Manual System (POMS) § GN 02250.061(A)(1). Here, Kurtz did not actively seek information about the disability benefits she continued to receive while earning SGA. Although Kurtz testified that she did not think she had a responsibility to look into it (R. 280), SSA regulations provide that an individual has a duty to exercise a high degree of care when determining whether to bring a matter to the SSA's attention or by returning a benefit check. *See* 20 C.F.R. § 404.511. The capacity of the individual to realize that she is being overpaid is a factor to consider in determining the standard of care. *Id.* Here, there is sufficient evidence that Kurtz, at all relevant times, had the capacity to understand there were set monthly earnings limitations which impact disability eligibility.

evidence to support the ALJ's decision that Kurtz was materially at fault in causing the overpayment and not entitled to a waiver of recovery.

### 3. *Kurtz's Claim that Recovery of Overpayment Defeats the Purpose of Title II and is Against Equity and Good Conscience*

Because there was substantial evidence to support the ALJ's decision that Kurtz was not "without fault" in causing the overpayment, as set forth above, it is unnecessary to determine whether a denial of waiver defeats the purpose of Title II or is against equity and good conscience. *See* 42 U.S.C. § 404; *see also* 20 C.F.R. §§ 404.508, 404.509.

Although the issue need not be reached, it is noted, nonetheless, that Kurtz's assertions that recovery would deprive her of income required for ordinary and necessary living expenses are specious. Kurtz reported that each month she received $3,702 in take home pay, $1,450 in child support and alimony, and $1,326 in self-employment, as well as some miscellaneous earning, for a total of over $6,500 a month for living expenses. (R. 45). According to Kurtz, this is not enough for her ordinary and necessary living expenses. Kurtz has income that exceeds reasonable living expenses.

The Commissioner argues and the Court agrees that $2,010 mortgage, $415 car payment, $686 church/charity donation, $469 home cleaning and lawn service, and a $524 pre-paid college tuition plan are not ordinary and necessary living expenses. (R. 46). Incredulously, Kurtz noted that many items were not included in the expense calculation, such as "toiletries, household items, books, girls' miscellaneous expenses (camps, retreats, youth group activities, uniforms for ballet, dance, etc.), hair cuts, gifts, entertainment, vacations, dry-cleaning, internet services, cellular phone, over-the-counter

medications, and all my business expenses associated with my self-employment." (R. 48). In this regard, the ALJ correctly noted that "Kurtz's entitlement to Social Security benefits was conditioned upon her disability, not the maintenance by the government of a lifestyle she engaged in prior to a divorce." (R. 29). Similarly, Kurtz's argument that it is against equity and good conscience to require her to repay the overpayment is without merit. As aptly set forth by the ALJ, "[i]t would be against equity and good conscience not to recover the overpayment."

### III.    *Conclusion*

Accordingly, it is therefore

**ORDERED** that Kurtz's Motion for Summary Judgment (Docket Entry No. 12) is **DENIED**. It is further

**ORDERED** that the Commissioner's Motion for Summary Judgment (Docket Entry No. 14) is **GRANTED**. It is finally

**ORDERED** that the Commissioner's decision denying Kurtz's request for waiver of overpayment of benefits is **AFFIRMED**.

**SIGNED** at Houston, Texas on this 31st day of March, 2009.

Calvin Botley
United States Magistrate Judge